CHRISTINE NESTOR, Fla. Bar No. 597211
Email: nestorc@sec.gov
RUSSELL KOONIN, Fla. Bar No. 0474479
Email:  kooninr@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, FL 33131
Telephone:  (305) 982-6300
Facsimile: (305) 516-4154

LOCAL COUNSEL
DONALD W. SEARLES, Cal. Bar No. 135705
Email: searlesd@sec.gov
U.S. Securities and Exchange Commission
444 S. Flower St., Suite 900
Los Angeles, CA 90071
Telephone: (323) 965-3398
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

       vs.

ROBERT S. "LUTE" DAVIS, JR.,
DONALD ANTHONY MACKENZIE,
AARON R. ANDREW, JEFFREY L.
WENDEL, RANDY T. RONDBERG,
RICHARD FRITTS, MARCUS
BRADFORD BRAY, GREGORY W.
ANDERSON, CLAUDE STEVEN
MOSLEY, GREGORY A. KOCH,
OLD SECURITY FINANCIAL
GROUP, INC., PARAMOUNT
FINANCIAL SERVICES, INC., D/B/A
LIVE ABUNDANT, WENDEL
FINANCIAL NETWORK, LLC,
A/K/A WENDEL RETIREMENT
PLANNING, TRAGER LLC, FRITTS
FINANCIAL, LLC, BRADFORD
SOLUTIONS, LLC, BALANCED
FINANCIAL, INC., SECURITY
FINANCIAL, LLC, and KOCH
INSURANCE BROKERS, LLC.

Case No.:   2:18-cv-10481

**COMPLAINT**

**JURY TRIAL DEMANDED**

1

Defendants.

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## JURISDICTION AND VENUE

1. The Commission brings this action pursuant to Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)], and Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)].

2. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

3. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. §1391(b)(2).

4. The Woodbridge Group of Companies LLC and its affiliates ("Woodbridge") was headquartered and ran its operations in the Central District of California, specifically Sherman Oaks, California. The Defendants were all salespersons of Woodbridge's securities and transacted business in the Central District of California while participating in the offer and sale of Woodbridge's securities.

5. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or

instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

6.     The Defendants will, unless enjoined, continue to engage in the acts, practices, transactions and course of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar purport and object.

## SUMMARY

7.     Beginning in May 2014 through December 2017, the Defendants in this action served as unregistered brokers on behalf of Woodbridge raising approximately $188 million from the offer and sale of Woodbridge's unregistered securities from approximately 3,000 retail investors located throughout the United States.    The Defendants collectively earned approximately $10.5 million in transaction based sales commissions.

8.     The Defendants pitched investors, both pre-existing clients and newly found, via telephone, e-mail and at in-person meetings providing them Woodbridge's sales materials touting Woodbridge's securities as "safe and secure."

9.     Unbeknownst to the Defendants' clients, many of whom were elderly and had invested their retirement savings at the behest of the Defendants' marketing techniques, Woodbridge was actually operating a massive Ponzi scheme, raising more than $1.2 billion before collapsing in December 2017 and filing a petition for bankruptcy.  The Defendants' marketing techniques included television, radio, newspaper, and social media advertisements, and direct communications via e-mail, telephone calls, in-person meetings and investment seminars which routinely touted Woodbridge's securities as "safe and secure." Once Woodbridge filed for bankruptcy, investors stopped receiving their monthly interest payments, and have not received a return of their investment principal.

10.  At all relevant times, the Defendants held no securities licenses, were not registered with the Commission, and were not associated with registered broker-dealers.  Further, Woodbridge's securities were not registered with the Commission nor did they qualify for an exemption from registration.  Defendants were thus not permitted to sell Woodbridge's securities.

## FACTS

### The Defendants

11.  **Robert S. "Lute" Davis, Jr. ("Davis")**, is a resident of Spring, Texas, and the Vice President of Old Security Financial Group, Inc. ("Old Security").  From at least June 2014 to July 2015, Davis personally solicited and sold unregistered Woodbridge securities to investors located in at least seven states.  Davis is not and has never been registered as or associated with a registered broker-dealer.

12.  **Donald Anthony Mackenzie ("Mackenzie")**, is a resident of Spring, Texas, and is the owner of Old Security.  From at least June 2014 to July 2015, Mackenzie personally solicited and sold unregistered Woodbridge securities to investors located in at least seven states.  Mackenzie is not and has never been registered as or associated with a registered broker-dealer.

13.  **Old Security** is a Texas corporation, wholly owned by Mackenzie, with offices in Spring, Texas, engaged in selling investment products, including Woodbridge's securities, to retail investors.  Old Security is not and has never been registered as or associated with a registered broker-dealer.

14.  **Aaron R. Andrew ("Andrew")**, is a resident of Holladay, Utah, and is a Supervisory Producer at Paramount Financial Services, Inc., d/b/a Live Abundant ("Live Abundant").  From at least November 2015 to July 2017, Andrew personally solicited and sold unregistered Woodbridge securities to

investors located in at least nine states.  Andrew is not and has never been registered as or associated with a registered broker-dealer.

15. **Live Abundant** is a Utah corporation with offices in Salt Lake City, Utah, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors.  Live Abundant is not and has never been registered as or associated with a registered broker-dealer.

16. **Jeffrey L. Wendel ("Wendel")** is a resident of Fort Recovery, Ohio, and is the owner of Wendel Financial Network, LLC (a/k/a Wendel Retirement Planning) ("Wendel Financial").  From at least June 2014 to September 2017, Wendel personally solicited and sold unregistered Woodbridge securities to investors located in at least four states.  During this time period, Wendel was not registered as or associated with a registered broker-dealer.

17. **Wendel Financial** is an Ohio limited liability company, wholly owned by Wendel, with offices in Fort Recovery, Ohio, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors.  Wendel Financial is not and has never been registered as or associated with a registered broker-dealer.

18. **Randy T. Rondberg ("Rondberg")** is a resident of Mesa, Arizona, and is the owner of Trager LLC ("Trager").  From at least February 2015 to November 2016, Rondberg personally solicited and sold unregistered Woodbridge securities to investors located in at least seven states.  During this time period, Rondberg was not registered as or associated with a registered broker-dealer.

19. **Trager** is an Arizona limited liability company, wholly owned by Rondberg, with offices in Mesa, Arizona, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors.

Trager is not and has never been registered as or associated with a registered broker-dealer.

20. **Richard Fritts ("Fritts")** is a resident of Knoxville, Tennessee, and is the owner of Fritts Financial, LLC ("Fritts Financial").  From at least July 2014 to November 2017, Fritts personally solicited and sold unregistered Woodbridge securities to investors located in at least three states.  During this time period, Fritts was not registered as or associated with a registered broker-dealer.

21. **Fritts Financial** is a Tennessee limited liability company, wholly owned by Fritts, with offices in Knoxville, Tennessee, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors.  Fritts Financial is not and has never been registered as or associated with a registered broker-dealer.

22. **Marcus Bradford Bray ("Bray")** is a resident of American Canyon, California, and is the owner of Bradford Solutions, LLC ("Bradford Solutions"). From at least June 2014 to October 2017, Bray solicited and sold unregistered Woodbridge securities to investors located in at least four states.  Bray is not and has never been registered as or associated with a registered broker-dealer.

23. **Bradford Solutions** is a California limited liability company with offices in American Canyon, California, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors. Bradford Solutions is not and has never been registered as or associated with a registered broker-dealer or investment adviser.

24. **Gregory W. Anderson ("Anderson")** is a resident of Fort Collins, Colorado, and is the owner of Balanced Financial, Inc. ("Balanced Financial"). From at least June 2014 to November 2017, Anderson personally solicited and sold unregistered Woodbridge securities to investors in at least five states.

During this time period, Anderson was not registered as or associated with a registered broker-dealer.

25. **Balanced Financial** is a Colorado corporation, wholly owned by Anderson and his spouse, with offices in Fort Collins, Colorado, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors. Balanced Financial is not and has never been registered as or associated with a registered broker-dealer.

26. **Claude Steven Mosley ("Mosley")**, is a resident of Myrtle Beach, South Carolina, and the sole owner of Security Financial, LLC ("Security Financial"). From at least May 2015 to November 2017, Mosley personally solicited and sold unregistered Woodbridge securities through his company Security Financial, to retail investors located in seven states. During this time period, Mosley was not registered as or associated with a registered broker-dealer.

27. **Security Financial** is a South Carolina limited liability company, wholly owned by Mosley, with offices in Myrtle Beach, South Carolina, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors. Security Financial is not and has never been registered as or associated with a registered broker-dealer.

28. **Gregory A. Koch ("Koch")** is a resident of Douglassville, Pennsylvania, and is the owner of Koch Insurance Brokers, LLC ("Koch Insurance"). From at least November 2015 to October 2017, Koch personally solicited and sold unregistered Woodbridge securities to investors located in at least six states. While from July 16, 2015 to June 26, 2018, Koch was associated with two registered investment adviser firms, but neither of these firms held or offered Woodbridge securities.

29. **Koch Insurance** (f/k/a Koch Financial Advisors & Insurance Brokers, LLC) is a Pennsylvania limited liability company, wholly owned by

Koch, with offices in Douglassville, Pennsylvania, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors. Koch Insurance is not and has never been registered as or associated with a registered broker-dealer.

### Relevant Entities and Individuals

30. **Woodbridge** is a Sherman Oaks, California-based financial company not registered with the Commission in any capacity with no publicly traded stock. Formed in 2012, Woodbridge had approximately 130 employees in offices in six states. On December 4, 2017, Woodbridge filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware. *In re Woodbridge Group of Companies LLC, et al.,* Case No. 17-12560 (jointly administered) (Bankr. D. Del. Dec. 4, 2017).

31. **Robert H. Shapiro, ("Shapiro")** is a resident of Sherman Oaks, California. He was Woodbridge's owner, President and CEO and, until the company's bankruptcy filing, maintained sole operational control over the company. Shapiro is not, and has never been, registered with the Commission, FINRA, or any state securities regulator.

### Woodbridge Background

32. Beginning in July 2012 through at least December 4, 2017, Shapiro and Woodbridge orchestrated a massive Ponzi scheme raising in excess of $1.22 billion from the sale of unregistered securities to over 8,400 investors nationwide. At least 2,600 of these investors used their Individual Retirement Account funds to invest nearly $400 million. The Defendants, are collectively responsible for raising approximately $188 million from approximately 3,000 investors.

**A. Woodbridge's Securities and Representations to Investors**

33. Woodbridge sold investors two primary types of securities: (1) twelve-to-eighteen month term promissory notes bearing 5%-8% interest that

Woodbridge described as First Position Commercial Mortgages ("FPCM Notes" and "FPCM Investors"), which were issued by one of Woodbridge's several affiliated Fund Entities, and (2) seven different private placement fund offerings with five-year terms: (a) Woodbridge Mortgage Investment Fund 1, LLC; (b) Woodbridge Mortgage Investment Fund 2, LLC; (c) Woodbridge Mortgage Investment Fund 3, LLC; (d) Woodbridge Mortgage Investment Fund 3A, LLC; (e) Woodbridge Mortgage Investment Fund 4, LLC; (f) Woodbridge Commercial Bridge Loan Fund 1, LLC; and (g) Woodbridge Commercial Bridge Loan Fund 2, LLC; (collectively "Fund Offerings" and "Fund Investors").

### 1. FPCM Notes

34. Woodbridge represented that the FPCM Notes were a "simple, safer and more secured opportunity for individuals to achieve their financial objectives." The purported revenue source enabling Woodbridge to make the payments to FPCM Investors was the interest Woodbridge would be receiving from mainly one-year loans to supposed third-party commercial property owners ("Third-Party Borrowers"). Woodbridge told investors that these Third-Party Borrowers were paying Woodbridge 11-15% annual interest for "hard money," short-term financing. Woodbridge would secure the debt through a mortgage on the Third-Party Borrowers' real estate. For example, Woodbridge wrote in marketing materials that "Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your [FPCM] documents."

35. In truth and in fact however, Woodbridge created false promissory notes evidencing these payments from Third Party Borrowers and incorporated these documents by reference in the promissory notes provided to each investor.

36. The FPCM Investors invested their funds in a common enterprise with the expectation of earning the promised returns based on the efforts of others, while maintaining a secured interest in a parcel of real estate.

37. The profitability of the FPCM investments was derived solely from the efforts of Shapiro and Woodbridge and the investments were in a common enterprise. Once investors provided their funds to Woodbridge, their funds were commingled with other investors' funds and used by Woodbridge for general business purposes. Investors had no control over how Shapiro and Woodbridge used their money. Because Woodbridge was a Ponzi scheme, its ability to pay returns depended upon its continued ability to raise funds from new investors and convince existing investors to rollover their investments. Woodbridge informed investors that it conducted all due diligence including title search and appraisal on the commercial property and supposed Third-Party Borrower. The investors played little or no role in selecting which properties would purportedly secure their investments. The defendants also provided each investor marketing materials prepared by Woodbridge that reassured investors, telling them not to worry about borrowers failing to make their loan payments because Woodbridge would continue to pay investors their interest payments.

## 2. Fund Offerings

38. Woodbridge offered the Fund Offerings to investors through one of its affiliated Fund Entities, pursuant to purported exemptions from registration under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from investors. In the Regulation D filings, Woodbridge described the Fund Offerings as "equity" securities.

39. Woodbridge, in avoiding registration of its securities with the Commission, purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term

with a 6% to 10% aggregate annual return paid monthly to Fund Investors and a 2% "accrued preferred dividend" to be paid at the end of the five-year term and a share of "profits."   Neither Woodbridge nor the Defendants ensured that only accredited investors purchased the Fund Offerings (or the FPCMs).

40.   In the offering memoranda for the Fund Offerings, Woodbridge represented to Fund Investors that their funds would be used for real estate acquisitions and investments, notably including Woodbridge's FPCMs.   The Fund Offerings, in effect, were investments into pooled FPCMs.   Many of these pools contained 40 or more investors.

41.   Investors in the Fund Offerings invested in a common enterprise with the expectation of profit based on the efforts of others.   The allegations of paragraphs 36 and 37 of this Complaint are applicable to the Fund Offerings as well.

42.   The FPCM Notes and the Fund Offerings are securities within the meaning of Securities Act § 2(a)(1), 15 U.S.C. § 77b(a)(1), and Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10).   Investors were unquestionably motivated by the high rate of returns that Woodbridge offered and investors viewed these as passive investments generating safe returns.   Woodbridge sold the FPCM Notes to a broad segment of the public (at least 8,400 investors) through general solicitations and there were no risk-reducing factors indicating the FPCM Notes were not securities.   Neither the FPCM Notes nor the Fund Offerings were registered with the Commission, and there was no applicable exemption from registration.

B.  Woodbridge's Misrepresentations

43.   Woodbridge's claim that it was using investors' funds to make high interest rate loans to Third-Party Borrowers" was a lie.   In reality, Woodbridge's business model was a sham.   Investors' funds were used to purchase, in the name

of a Shapiro controlled Limited Liability Company (LLC), almost 200 residential and commercial properties, primarily in Los Angeles, California and Aspen, Colorado.  Thus, nearly all the "third-party" borrowers were Shapiro owned and controlled shell company LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors.

44. Because Shapiro's LLCs were not making any of the promised interest payments and Woodbridge's other revenue was minimal, Woodbridge sought to convince FPCM Investors to rollover their investment into a new note at the end of the term, so as to avoid having to come up with the cash to repay the principal.  For the payment of returns to FPCM and Fund Investors and redemptions to FPCM Investors who did not rollover their notes, Woodbridge raised and used new investor funds, in classic Ponzi scheme fashion.

45. Finally, on December 1, 2017, after amassing more than $1.22 billion of investor money, with more than $961 million in principal still due to investors, Woodbridge and Shapiro missed their first interest payments to investors after purportedly ceasing their fundraising activities.  Without the infusion of new investor funds, just days later, on December 4, 2017, Shapiro caused most of his companies to be placed in Chapter 11 Bankruptcy.

46. In the Chapter 11 Bankruptcy, Woodbridge, now under the control of independent management, took the position that the FPCM Investors do not have a secured interest in the property underlying their investment because they were required to perfect their interest pursuant to the requirements of the Uniform Commercial Code, which virtually none of the investors did.

**C.   Defendants Offered and Sold Woodbridge Securities**

47. Woodbridge recruited a network of approximately 2,000 external, mostly unregistered, sales agents, including the Defendants.   Woodbridge

provided the Defendants with the information and marketing materials that the Defendants gave to FPCM and Fund Investors.

48. Using the Woodbridge-provided materials, information and talking points, the Defendants advertised the Woodbridge securities via radio, in magazines and newspapers, via promotions sent via U.S. mail, by email and telephone, and through private in-person meetings and larger scale sales seminars to groups of investors.

49. Once in contact with a potential investor, the Defendants assured the safety and profitability of the Woodbridge investment. The Defendants touted the purported security of the properties the investments were tied to by virtue of their favorable loan-to-value ratios, Woodbridge's long tenure and track record in the industry, and the purported first position lien the investors would have on the properties in the event of a default by the "third party" borrower.

50. If a customer decided to invest in the FPCM Note program, the Defendants filled out a Woodbridge online form identifying their customer, the amount of investment (with the minimum being $25,000), and selecting the Woodbridge property that would purportedly collateralize the clients' note. (The Defendants would often select the property without customer input, frequently just checking a box for their customer to receive the next available property without knowing anything about it). Woodbridge's processing department then generated a loan agreement and promissory note and sent the documents to the Defendants. Investors typically provided the Defendants the signed documents and the check for their principal investment, and the Defendants returned the package to Woodbridge. The investor then received monthly interest payments directly from Woodbridge.

51. Woodbridge offered its FPCM Notes to Defendants at a 9% wholesale annual interest rate, who then would offer these notes to their investor clients at

5% to 8% annual interest rate—the difference representing the Defendants' transaction-based commissions.

52. For the Fund Offerings, each of the Defendants received a 5% sales commission that Woodbridge purposefully mischaracterized as a "marketing bonus" to avoid the appearance of paying transaction-based commissions to unregistered sales agents.

53. The Defendants encouraged their clients to rollover their investments at their term expiration, either into another 12-18 month FPCM Note, or into a five-year Fund Offering. Defendants received transaction-based sales commissions for rollovers, with a five-year Fund Offering rollover receiving a greater commission than a FPCM rollover. Defendants profited from doing so because Woodbridge achieved a 90% rollover rate.

54. Overall, Woodbridge collectively paid the Defendants approximately $10.5 million in transaction-based sales commissions through this arrangement, as follows:

- Davis, Mackenzie and Old Security:  From May 2014 through July 2015 – approximately $2 million in transaction-based commissions earned as a result of raising approximately $41.2 million from 300 investors in seven states.

- Andrew and Live Abundant:  From November 2015 through July 2017 – approximately $1.8 million in transaction-based commissions earned as a result of raising approximately $43 million from 350 investors in 9 states.

- Wendel and Wendel Financial:  From July 2014 through September 2017 – approximately $1.7 million as a result of raising approximately $25 million from 750 investors in 4 states.

- Rondberg and Trager:  From February 2015 through November 2016 – approximately $918,000 as a result of raising approximately $15.5 million from 500 investors in 7 states.

- Fritts and Fritts Financial:  From July 2014 through November 2017 – approximately $842,000 as a result of raising approximately $13.8 million from 195 investors in 3 states.

- Anderson and Balanced Financial:  From approximately June 2014 through November 2017 – approximately $776,000 as a result of raising approximately $13 million from 375 investors in 5 states.

- Bray and Bradford Solutions:  From approximately June 2014 through October 2017 – approximately $733,000 as a result of raising approximately $10.4 million from 150 investors in 4 states.

- Mosley and Security Financial:  From approximately May 2015 through November 2017 – approximately $628,000 as a result of raising approximately $13 million from 175 investors in 7 states.

- Koch and Koch Insurance:  From November 2015 through October 2017 – approximately $592,000 as a result of raising $13.4 million from 150 investors in 6 states.

55.   During the time the Defendants sold Woodbridge securities, the Defendants held no securities licenses, were not registered with the Commission, and were not associated with registered broker-dealers; Further, Woodbridge's securities were not registered with the Commission and did not qualify for an exemption from registration.   Defendants were thus not permitted to sell Woodbridge's securities.

## COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

### [15 U.S.C. §§ 77e(a) and 77e(c)]

56.   The Commission repeats and realleges paragraphs 1 through 55 of this Complaint as if fully set forth herein.

57.   No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities offered and sold by the Defendants as described in this Complaint and no exemption from registration existed with respect to these securities.

58.   During the periods specified in paragraph 53, the Defendants directly and indirectly:

(a)   made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)   carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)   made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security;

without a registration statement having been filed or being in effect with the Commission as to such securities.

59.   By reason of the foregoing the Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Section 15(a)(1) of the Exchange Act
### [15 U.S.C. § 78o(a)(1)]

60.   The Commission repeats and realleges Paragraphs 1 through 55 of this Complaint as if fully set forth herein.

61.   During the periods specified in paragraph 54, the Defendants, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate

commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer.

62. By reason of the foregoing, the Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests the Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the violations charged and alleged herein.

### II.

Issue a Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining all Defendants, their agents, servants employees, and attorneys, and those persons in active concert or participation  with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from, directly or indirectly, violating Sections 5(a) and 5(c) of the Securities Act and Section 15(a)(1) of the Exchange Act.

### III.

Issue an Order directing the Defendants to disgorge all ill-gotten gains or proceeds received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

**IV.**

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

**V.**

Retain jurisdiction over this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other relief as this Court may deem just and appropriate.

**JURY DEMAND**

The Commission requests a trial by jury.

December 18, 2018                                    Respectfully submitted,

By: /s/ *Donald W. Searles*
Attorney for Plaintiff
Securities and Exchange Commission

18